**UNTIED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

UNITED STATES OF AMERICA,

   Plaintiff,

v.

             CASE NO. 12-20676

             HON. MARIANNE O. BATTANI

MARCUS ORANDE ELLIOTT,

   Defendant.
_____/

**OPINION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS**

   This matter is before the Court on Defendant Marcus Elliott's Motion to Suppress evidence and statements obtained by police officers in violation of the Fourth Amendment. (Doc. 13). The Court heard oral argument on the motion on January 9, 2013, and at the conclusion, took the matter under advisement. For the reasons stated below, the Court **DENIES** Defendant's motion.

**I. INTRODUCTION**

   In response to complaints regarding illegal drug-related activity in the City of Detroit, the Wayne County Sheriff's Office implemented "Campaign Push-Off." Under the program, vehicle forfeiture proceedings are brought against those who engage in "(1) [t]he purchase, sale or transportation or the intended purchase, sale or transportation of narcotics; OR 2) the facilitation of a violation of the State's drug laws." (Doc. 15 Ex. A). A claimant whose vehicle is seized may either post bond and contest the seizure, or enter into a settlement agreement and pay a $900.00 fine. Failure to

take action within twenty days results in a complete forfeiture of the vehicle. This program derives its authority from Mich. Comp. Laws § 333.7521(1).

## II. FINDINGS OF FACT

In furtherance of Campaign Push-Off, Wayne County Police Officers Radken Smith, Monty Holiday, and Assad Turfe set up a reverse sting at the BP gas station at the corner of West 7 Mile Road and Rutherford Street on September 27, 2012. A reverse sting is a police operation in which an officer poses as a drug dealer in order to sell or negotiate a sale of drugs with target buyers. See United States v. Pipes, 87 F.3d 840, 841 (6th Cir. 1996). In order to carry out the sting, Smith posed as a street-level drug dealer outside of the gas station. Holiday served as the "eye," responsible for watching Smith from an unmarked police car twenty feet away. Holiday maintained radio contact with a team of officers responsible for stopping the vehicle of the target buyer. Turfe served as a member of the takedown team in another unmarked police car located a block north of the gas station.

At or around 12:10 P.M., Elliott drove his black Dodge Avenger up to the BP station and parked at one of the pumps. As he approached the station, he walked past Smith and asked if he had any "trees," a street term for marijuana. In response, Smith asked what Elliott needed. Elliott stated that he wanted a "nickel" of "weed." Smith indicated that he was out, but that Elliott should return in ten minutes. Elliott then proceeded to enter his car and drive east on West Seven Mile Road. It is undisputed that Elliott did not furnish any cash to Smith or suggest Smith meet him in another location at a later time to complete the sale.

Next, Smith gestured a predetermined signal to Holiday indicating that Elliott had attempted to purchase marijuana. Holiday then proceeded to inform the takedown team that this was a "good case," meaning Elliott had solicited the sale of a controlled substance. As part of the takedown team, Turfe followed Elliott's car and activated his siren lights. Elliott eventually stopped. Turfe approached the vehicle and instructed Elliott to step out. As this occurred, Turfe noticed a small plastic bag in the shirt pocket of Elliott. Elliott could not provide a valid license, so Turfe conducted a pat down and recovered a small bag containing marijuana. Elliott was arrested and placed in the back of Turfe's car. His vehicle was impounded. During the standard inventory search of Elliott's vehicle, police discovered a loaded .38 caliber Smith and Wesson revolver and holster. At the station, Elliott waived his Miranda rights and admitted ownership of the gun. He also admitted that he attempted to buy a nickel bag of marijuana at the BP station.

Subsequently, a grand jury charged Elliott as a felon in possession of a firearm transported in interstate commerce in violation of 18 U.S.C. § 922(g)(1). (Doc. 9). The indictment included a forfeiture allegation for the .38 caliber Smith and Wesson gun. In response, Elliott filed this motion to suppress the gun, the bag of marijuana, and admissions made to officers while in custody. Elliott argues the evidence is tainted as fruits of an illegal search because the officers did not have reasonable suspicion or probable cause to conduct a vehicle stop under Terry v. Ohio, 392 U.S. 1 (1968).

### III.   ANALYSIS

The Fourth Amendment protects citizens from unreasonable searches and seizures. U.S. Const. amend. IV. "Stopping a vehicle and detaining its occupants

amounts to a seizure under the Fourth Amendment." United States v. Freeman, 209 F.3d 464, 466 (6th Cir. 2000). In order for a stop to be reasonable under Sixth Circuit case law, "an officer must have probable cause to make a stop for a civil infraction, and reasonable suspicion of an ongoing crime to make a stop for a criminal violation." United States v. Blair, 524 F.3d 740, 748 (6th Cir. 2008). The Sixth Circuit summarized the state of the its Fourth Amendment jurisprudence as such:

> Police may make an investigative stop of a vehicle when they have reasonable suspicion of an ongoing crime, whether it be a felony or misdemeanor, including drunk driving in situations where that is a criminal offense [citations omitted]. Police may also make a stop when they have reasonable suspicion of a completed felony, though not of a mere completed misdemeanor [citations omitted].

Gaddis ex rel. Gaddis v. Redford Twp., 364 F.3d 763, 771 (6th Cir. 2004). Implicit in this analysis is that the probable cause standard applies to completed misdemeanors in the context of investigatory stops. See United States v. Hughes, 606 F.3d 311, 316 n.8 (6th Cir. 2010) ("Here, the government raises only either civil infractions or misdemeanors that were clearly *completed* by the time [the officer] actually stopped [defendant]. In other words, in order for the stop to have been proper in this case, [the officer] needed to have probable cause rather than reasonable suspicion that [defendant] had violated [the statute].") (emphasis in original). Thus, officers must have probable cause to make an investigatory stop for a completed misdemeanor.

Here, Elliott argues the offense that lead officers to conduct the investigatory stop was completed and is not a felony under Michigan law. Therefore, he asserts, the fact that the officers had reasonable suspicion is insufficient to justify the stop. In the event the Court agrees, he argues Turfe, the takedown officer, did not have probable cause to make the stop for a completed misdemeanor because he had no first-hand knowledge

4

of the unlawful activity. He relies on the fact that Turfe did not actually witness the offense, but received information of it collectively as part of the task force. Thus, Elliot asserts the gun, marijuana, and his admissions at the station were obtained in violation of the Fourth Amendment.

### A. Nature of the Offense

The Government argues that the officers stopped Elliott's vehicle for soliciting the delivery of marijuana in violation of Mich. Comp. Laws §§ 333.7401(2)(d)(iii), 7407a. Section 7401 provides that the delivery of marijuana in the amount of less than five kilograms is a felony punishable by imprisonment up to four years. Section 7407a provides that "[a] person shall not knowingly or intentionally solicit, induce, or intimidate another person to violate [Michigan's controlled substances laws]," the penalty for which is the same as the crime solicited. In other words, the Government asserts Elliott committed a felony when he asked Smith for a nickel bag of weed.

If Elliott had actually purchased the marijuana from Smith, he would have violated M.C.L. § 333.7403(2)(d)(iii) for possession of marijuana, a misdemeanor punishable by no more than one year in prison. The Court notes the alarming disparity between the two scenarios. Under the Government's theory, Elliott faces a substantially harsher penalty for engaging in conduct far below possession as opposed to actually acquiring possession of the controlled substance. The Government argues that because a person who sells a controlled substance necessarily delivers it to the buyer, "a person who solicits the sale of the controlled substance necessarily commits the felony of soliciting the delivery of marijuana." In other words, every purchase or attempted purchase of a controlled substance is a solicitation of the delivery of

marijuana, and in turn, every violation of § 333.7403(2)(d)(iii) constitutes a felony. This interpretation of the statutes is unreasonable. The conduct of Elliott falls far below that of a felony. Elliott did not seek to purchase a large amount of marijuana, carrying with it the implication of intent to distribute; nor did he employ another to buy or sell controlled substances on his behalf. He did not urge or coerce Smith to sell it to him. Elliott sought only to purchase a miniscule amount for personal use, and did so merely by inquiring as to whether Smith had a nickel bag for sale. The Government markedly fails to cite any case law endorsing its theory. Thus, the Court declines to embrace it.

In sum, the only potential offense the officers could have reasonably suspected Elliott of committing is attempted possession of marijuana. See M.C.L. § 333.7403(2)(d); People v. Castillo, 266 N.W.2d 460, 463 (Mich. Ct. App. 1978). This is a misdemeanor offense under Michigan law and controls the Court's inquiry into the reasonableness of the investigatory stop. Although the Government fails to raise this offense as justification for the stop, the Court does on its own accord, as probable cause must be viewed from the perspective of a reasonable officer at the scene, not the Government's retrospective characterization of the offense.

### B. Probable Cause

As stated above, an officer must have probable cause of a completed misdemeanor to justify an investigative stop. See Hughes, 606 F.3d at 316 n.8. "Probable cause is a reasonable ground for belief supported by less than prima facie proof but more than reasonable suspicion." United States v. Blair, 524 F.3d 740, 748 (6th Cir. 2008) (citing United States v. Jackson, 470 F.3d 299, 306 (6th Cir. 2006) (quoting Unites States v. Bennett, 905 F.2d 931, 934 (6th Cir. 1990))). The subjective

intent of the officer is irrelevant. Id. This analysis is viewed from the perspective of an objectively reasonable officer depending on the totality of the circumstances. Maryland v. Pringle, 540 U.S. 366, 371 (2003). Elliott argues the officers did not have probable cause that he engaged in *any* criminal activity. Alternatively, he asserts that Turfe, the officer who made the stop, did not actually perceive the criminal conduct and cannot rely upon the observations of his fellow task force members.

The Court first addresses the perspective of Smith as the undercover drug dealer. Smith posed in an area known to officers to involve high demand of controlled substances. In fact, the Wayne County Sheriff's office received numerous complaints involving drug-trafficking on the premises of the gas station. On the date in question, Elliott approached Smith and asked him if he had any "trees." In response to Smith's question regarding quantity, Elliott stated he needed a "nickel bag." In light of the totality of the circumstances, namely, the use of street terms, it is clear Smith had probable cause to believe Elliott was attempting to purchase a nickel bag of marijuana. The fact that Elliott did not approach Smith with money in hand or use more specific terms does not negate probable cause. Illegal drug deals do not operate in the same light as legal transactions. Dealers and buyers are often vague, using street names and signals in order to avoid such obvious appearance of illegal activity. Nonetheless, Smith knew the use of "trees" and "nickel bag" unequivocally referred to an amount of marijuana normally purchased from a dealer. The fact that the transaction never reached completion is of no import; Smith had probable cause after the brief conversation to believe that if he furnished a nickel bag to Elliott, Elliott would have

purchased it. Certainly, it was reasonable for Smith to determine Elliott attempted to purchase and possess a controlled substance.

Even if Smith had probable cause, Elliott asserts Turfe, the takedown officer who made the stop, did not have probable cause because he was merely a member of the task force with no personal perception of the conduct in question. Essentially, Elliott argues probable cause did not transfer from Smith to Turfe merely because Smith acquired it as a member of the team. It should follow that, because Smith did not make the stop himself, it is invalid. In support, Elliott cites United States v. Blair. In Blair, two officers, one undercover in front of the house and one in uniform located around the corner, were sent to a known drug-trafficking house. 524 F.3d at 744. The court rejected the government's argument that because the undercover officer witnessed the defendant engage in a possible drug transaction outside the house and then communicated this to the uniformed officer, their collective knowledge justified the stop. Id. at 751-52. However, the court recognized that the uniformed officer was unaware of the potential drug transaction before he stopped the defendant's vehicle. Id. The court noted that the undercover officer "never communicated why [the defendant] should be stopped, or even that he should be stopped at all." Id. at 752.

Blair is distinguishable from the case at hand. Unlike Blair, Turfe had knowledge of the criminal activity before the stop was made. Using the predetermined case signal, Smith communicated to Holiday that Elliott had attempted to purchase a controlled substance. Holiday then notified the takedown team (including Turfe) that Elliott was heading east on West Seven Mile Road in a black Dodge Avenger. Holiday proceeded to call Smith and inquire about the quantity and type of drugs Elliott attempted to

purchase. Holiday then radioed to Turfe that Elliott had asked for a nickel bag of marijuana. As opposed to the officer in Blair, Turfe knew the exact location of Elliott, the make and model of his car, and the offense officers believed Elliott committed. Turfe was instructed to stop Elliott, markedly different from Blair, in which the undercover officer testified that he did not believe he had probable cause of any criminal activity and that he did not instruct the uniformed officer to make the stop.

Here, it is clear Turfe had probable cause to conduct the stop from the information communicated to him by Holiday. Indeed, the Sixth Circuit has established that an investigatory vehicle stop may be conducted based on information received from another officer. See United States v. Barnes, 910 F.2d 1342, 1344 (6th Cir. 1990) (noting the rejection of the argument that "reasonable cause for a stop and frisk can only be based on the officer's personal observation, rather than on information supplied by another person.") (citing Adams v. Williams, 407 U.S. 143, 147 (1972)). Consequently, Turfe had sufficient probable cause to believe that Elliott had committed a misdemeanor in the presence of Smith to justify the stop. In light of the fact that Elliott does not challenge any subsequent steps taken by officers surrounding his arrest and inventory search of his vehicle, the Court's inquiry ends here.

## IV. CONCLUSION

Accordingly, the Court **DENIES** Defendant's motion to suppress.

**IT IS SO ORDERED.**

                                              s/Marianne O. Battani
                                              MARIANNE O. BATTANI
                                              UNITED STATES DISTRICT JUDGE

DATE: January 23, 2013

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the above date a copy of this Order was served upon all counsel of record via the Court's ECF Filing System.

<u>s/Bernadette M. Thebolt</u>
Case Manager